[Civ. No. 4718. Fourth Dist. Dec. 1, 1953.]

In re TONI HARMON, a Minor. DR. P. L. RASMUSSEN et al., Appellants, v. WARREN A. HARMON et al., Respondents.

James L. King for Appellants.

Frank Marino and John Lewis King for Respondents.

GRIFFIN, J.—Captain Warren A. Harmon and Bettilou Harmon are the parents of Toni Harmon, born June 20, 1943, in New Mexico. Mrs. Rasmussen, Bettilou's mother, and Dr. Rasmussen, her stepfather, lived in Ontario, California. Captain Harmon went to Texas in line of duty with the U. S. Air Force. Mrs. Harmon came to Ontario with the baby daughter and remained there about one month. She later went to Texas to be with her husband and left the baby with Mrs. Rasmussen. No arrangements were made in reference to the care of the child but its father and mother sent checks each month thereafter to the grandmother, which checks averaged about $30 per month for a period of around two years. They made occasional week-end trips to visit the child. Subsequently, the Harmons returned to Ontario and lived with the Rasmussens for four months. They subsequently moved to Claremont where, for the first time, they had the child in their home for a good portion of that period. The child was then about 3 or 4 years of age. Subsequently, they moved to Oakland and left the child with the Rasmussens and later the Rasmussens took it to its parents in Oakland, for schooling. About a month later, due to the child's illness, the Rasmussens returned it to their home in Ontario and it was cared for by them. The mother sent several $25-denomination government bonds, registered in the name of the child and its mother, to the Rasmussens, and also sent gifts, etc., on occasions. The Harmons were both employed during the period. They returned to Ontario on occasions to visit with the child who was then 5 years of age. Captain Harmon was transferred to Florida and his wife returned to Ontario, obtained an apartment and visited with and took the child with her on occasions when she was not working. Generally, however, she left its care with Mrs. Rasmussen, and apparently no definite arrangements were mentioned as to child care, and no further payments were made to Mrs. Rasmussen. Mrs. Harmon moved about from place to place and later joined her husband in other places where he had been transferred, but left the child in care of Mrs. Rasmussen.

Finally, in June, 1952, the Harmons returned to Ontario. The captain learned that he was being transferred to Okinawa. They suggested that they take the child with them and violent argument ensued between them and the Ras-

mussens. A bitter quarrel took place and on July 3, 1952, the Rasmussens filed this petition to be appointed guardians of the person of Toni, then aged 9 years, alleging that she had no guardian legally appointed by will or otherwise; that they were the grandparents of the minor; that for a number of years Toni had been under their care and resided with them; that the parents had knowingly and wilfully abandoned the child, having the ability to maintain it; that the Harmons were not fit and proper persons to have its custody; alleged that petitioners were fit and proper persons for this purpose; and that it was for the best interests and welfare of the child that the petitioners be appointed guardians.

Respondents answered and denied generally the allegations of the petition, and as an affirmative defense alleged that Captain Harmon was then stationed at Okinawa; that from time to time the child was left with Mrs. Rasmussen only for the purpose of convenience and mutual desires of all the parties; that they had no intention of abandoning the child; that the Rasmussens refused to give them, the natural parents, possession of it; that the Rasmussens taught the child to shun its parents; alleged that it was for the best interests of the child to be with its parents; and then alleged that the Harmons had, on July 14, 1952, filed a petition for a writ of habeas corpus seeking to restore Toni Harmon's liberty to petitioners; that the writ and order to show cause were issued and that such proceedings were still pending. They prayed that the Rasmussens' petition for appointment as guardians be denied and that custody of the child be given to the natural parents.

The petition for writ of habeas corpus and the petition for appointment of guardians were heard at the same time. The trial court found that the minor did have as her guardians her natural parents; that it was untrue that the Harmons knowingly or wilfully abandoned the child or neglected it; that the natural mother and father were fit and proper persons to have its custody and also that the Rasmussens were fit and proper persons for that purpose; that it was untrue that it was for the best interests and welfare of said minor that the Rasmussens be appointed guardians; that it was true that it was for the best interests and welfare of the child that the natural parents have such custody, and denied the petition for the appointment of guardians.

The court then granted the writ of habeas corpus but attached to the order granting it certain conditions allowing

the Rasmussens and Harmons alternate custody of the child each month until June, 1953, at which time the parents should have permanent custody.

We cannot here question the authority of the trial court to grant a *conditional* writ of habeas corpus since no appeal from the order is before us nor is such an appeal allowable. (*In re Bruegger,* 204 Cal. 169 [267 P. 101].) At any rate, the conditions of the writ apparently have been fulfilled at this time and the child has been ultimately restored to the custody of its natural parents.

 The first burden of a petitioner in a guardianship proceeding is to establish to the satisfaction of the court that the appointment of a guardian is "necessary or convenient." (Prob. Code, § 1440.) Although there is no direct finding on this question, in support of the judgment entered, we may well assume from the evidence and circumstances related that the trial court concluded that the appointment of a guardian was neither necessary nor convenient since the natural parents were living, had not abandoned the child, and were entitled to its custody under the order granting the writ of habeas corpus. Under these circumstances it would not be necessary for the trial court to make a determination of the remaining issues presented, and the order might well be sustained on this finding alone. (*Guardianship of Kentera,* 41 Cal.2d 639, 642 [262 P.2d 317] ; *Guardianship of Sloot,* 92 Cal.App.2d 296 [206 P.2d 862].)

The trial court proceeded to hear and determine the issue as to whether the parties involved were fit and proper persons to have custody of the minor, and concluded that they were. The evidence fully supports this finding. It then concluded that it was for the best interests of the child that the custody be awarded to its natural parents and not to the Rasmussens. Under ordinary circumstances this was a factual question for the determination of the trial court and without a finding in favor of petitioners (the Rasmussens) on this issue, they could not prevail as against the natural parents. (Civ. Code, § 197; *In re Gille,* 65 Cal.App. 617 [224 P. 784] ; *Stever* v. *Stever,* 6 Cal.2d 166 [56 P.2d 1229] ; *Roche* v. *Roche,* 25 Cal.2d 141 [152 P.2d 999] ; Prob. Code, § 1406; 13 Cal.Jur., pp. 153-155, § 13.) Accordingly, the order could be supported under this finding.

It appears to be the contention of counsel for the Rasmussens that the trial court did not consider the question of the best interests of the minor but decided their rights upon

a principle of law, i. e., that since it found that they and the Harmons were all fit persons to have the custody of the child, and not having specifically found that the natural parents were unfit, it was duty bound to find, as a matter of law, in favor of the natural parents under the authority of *Guardianship of Smith*,* (Cal.) 255 P.2d 761, and *Roche* v. *Roche*, 25 Cal.2d 141 [152 P.2d 999].

There is some suggestion in a memorandum of the trial judge indicating this conclusion. However, at the commencement of, and during the progress of the hearing, the trial judge announced: ''My own opinion is, after all, the yardstick which we use to measure these things is the best interests of the child,'' and ''the natural rights of parents.'' Under the authorities cited and such other cases as *Stewart* v. *Stewart*, 41 Cal.2d 447 [260 P.2d 44], with which this court is quite familiar (see 252 P.2d 740); *Guardianship of Sloot*, 92 Cal.App.2d 296 [206 P.2d 862]; *In re White*, 54 Cal.App. 2d 637 [129 P.2d 706]; and *Eddlemon* v. *Eddlemon*, 27 Cal. App.2d 343 [80 P.2d 1009], the trial court was also justified in making the order denying the application.

The case of *Guardianship of Smith, supra*, brought forth three strong dissenting opinions in reference to the operation of the rule under the facts of that case, and there was mention of similar dissenting opinions in other cases involving this point. It appears that a rehearing was granted in the Smith case. Petitioners here ask this court to disregard the holding of that case and anticipate that it will be reversed on the rehearing. We will not make this anticipation, nor decide that all cases bearing on this question will be overruled, until such action is actually taken. Regardless of the outcome of the decision in the Smith case, the trial court was justified in denying the petition for the appointment of the guardians under the circumstances here related.

Judgment and order affirmed.

Barnard, P. J., concurred.

Mr. Justice Mussell, being disqualified, does not participate herein.

Appellants' petition for a hearing by the Supreme Court was denied January 27, 1954. Schauer, J., was of the opinion that the petition should be granted.

---

*A rehearing was granted on May 14, 1953, and the final opinion of the Supreme Court is reported in 42 Cal.2d —— [265 P.2d 888].